Harley McKIBBEN, Adolph Vetter, and Roudolph Vetter, Appellants/Cross-Appellees,

v.

MOHAWK OIL COMPANY, LTD., Mohawk Oil & Gas Company, Ltd. and Tri-Con Mining, Inc., Appellees/Cross-Appellants.

Nos. 6654, 6674 and 6675.

Supreme Court of Alaska.

July 29, 1983.

State Legislature, 13–14 (1981).

James A. Parrish, Parrish Law Office, Joseph W. Sheehan, Fairbanks, for appellants/cross-appellees.

Joseph J. Perkins, Jr., Lynn M. Allingham, David Bundy, Ely, Guess & Rudd, Anchorage, for appellees/cross-appellants.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

BURKE, Chief Justice.

Plaintiffs Harley McKibben, Adolph Vetter, and Roudolph Vetter are the owners of the Christina mining claim located near Fairbanks. On December 2, 1977, plaintiffs entered into a mining lease agreement with Joseph Taylor and Paul Rice, giving Taylor and Rice the right to mine the land in a workmanlike manner until March 15, 1978. The lease also provided that the plaintiffs would receive forty-five percent of the value of all ores and minerals mined and extracted from the claims after deducting smelting and refining costs. Taylor and Rice would bear the entire costs of mining and milling the ore.

Taylor and Rice assigned their interest in the lease to Tri-Con Mining, Inc. [Tri-Con] with plaintiffs' consent. Plaintiffs and Tri-Con entered into an addendum of the lease, which provided that whenever the lessee's ore shipments had a specified low assayed value, plaintiffs' royalty interest would be reduced to ten percent.

Soon after Tri-Con began mining the Christina claim, Tri-Con entered into a joint venture with Mohawk Oil and Gas, Inc. [Mohawk Inc.], a wholly owned subsidiary of Mohawk Oil Company, Ltd. [Mohawk Ltd.]. With only two weeks remaining in the term of the lease, Tri-Con and Mohawk Inc. engaged in a bulk mining program during which some 12,000 to 15,000 tons of ore were mined from the property and shipped to the nearby Fox Mill. Tri-Con and Mohawk Inc. processed and milled approximately 6,000 tons of the stockpiled ore. The percentage recovery of precious metals from the ore was extremely low.

On October 9, 1979, Richard Savell, an attorney for plaintiffs, sent a letter to Mohawk Ltd. and Tri-Con. Savell disputed the meaning of the ten percent royalty provision in the addendum to the lease, and accused the assignees of diluting the ore and removing precious metals from the mill without reporting it to plaintiffs. Savell then demanded an accounting, and stated that "[l]essors hereby declare that they are immediately entitled to 45% of the ore presently stockpiled ...." Savell ended the letter by stating that "[i]n order to reach an understanding short of civil litigation, please contact this office within twenty days of the date of this letter."

On October 31, 1979, J.P. Tangen, attorney for Tri-Con and the Mohawk corporations, wrote to Savell and denied his allegations, but accepted Savell's offer to resolve the dispute, and asked Savell when his clients would remove their share of the ore. Savell subsequently advised Tangen that Savell's letter of October 9, 1979, was not an offer to reach an accord and satisfaction. Savell also denied that plaintiffs meant to give up their rights under the lease, such as the right to a forty-five percent royalty, in exchange for forty-five percent of the actual material stockpiled by Tri-Con and Mohawk Inc.

On March 21, 1980, plaintiffs filed a complaint against Tri-Con, Mohawk Ltd., and Mohawk Inc. First and second amended complaints were filed on September 18, 1980. As amended, the complaint alleges

that defendants breached the lease; committed waste and conversion; engaged in unworkmanlike mining; and intentionally diluted the ore. Plaintiffs also requested punitive damages for the "purposeful and outrageous conduct" committed by defendants. Defendants denied the allegations, and asserted various affirmative defenses, including accord and satisfaction.

Plaintiffs served interrogatories on Tri-Con requesting factual and legal details of all affirmative defenses including accord and satisfaction. Tri-Con objected to the interrogatories and plaintiffs filed a motion to compel discovery. The motion was denied by the superior court on February 4, 1981.

Defendants subsequently moved for partial summary judgment to dismiss plaintiffs' claims for intentional dilution, unworkmanlike mining, punitive damages, and waste. Plaintiffs moved for partial summary judgment to pierce the corporate veil of Mohawk Inc. Following a hearing on these motions, the superior court granted plaintiffs' motion, denied defendants' motion to dismiss plaintiffs' claims for waste, intentional dilution, and unworkmanlike mining, but dismissed plaintiffs' punitive damages claim.

After the parties filed trial briefs the superior court held a pretrial conference during which both the plaintiffs and defendants moved for summary judgment on the issue of accord and satisfaction. The court also addressed plaintiffs' claim for conversion, and reconsidered its previous ruling on plaintiffs' claim for waste. After reconsideration, the court dismissed plaintiffs' claim for waste, but refused to dismiss plaintiffs' claim for conversion. Finally, the court found that the Savell and Tangen letters constituted an accord and satisfaction of *all* the issues raised in plaintiffs' complaint. The court dismissed plaintiffs' complaint with prejudice and awarded defendants costs and limited attorney's fees. This appeal and cross-appeal followed.

## I. ACCORD AND SATISFACTION

■ "An accord is a contract under which an obligee promises to accept a stat-

ed performance in satisfaction of the obligor's existing duty." Restatement (Second) of Contracts § 281 (1979); *see also Stephenson v. Ketchikan Spruce Mills, Inc.,* 412 P.2d 496, 498 (Alaska 1966). The enforceability of an accord is governed by the rules applicable to the enforceability of contracts. Restatement (Second) of Contracts § 281 comment d (1979). Plaintiffs contend that Savell's letter of October 9, 1979, was not an offer to reach an accord, and that even if the letter was an offer, defendants knew or should have known that it was not meant to relinquish plaintiffs' royalty rights in exchange for an actual division of the stockpiled ore. Finally, plaintiffs contend that even if defendants' interpretation was correct, the offer was too indefinite and was untimely accepted.

■ We believe that even if Savell's letter of October 9, 1979, was an effective offer to relinquish plaintiffs' royalty rights in exchange for an actual division of the stockpiled ore, defendants did not accept the offer in a timely fashion. At the time an offeror makes his offer, he has full control of its terms, and may specify the time within which the acceptance is limited accordingly. 1 Corbin, Corbin on Contracts § 35, at 142 (1963); *see also Beirne v. Alaska State Housing Authority,* 454 P.2d 262, 264–65 (Alaska 1969). In Savell's letter of October 9, 1979, Savell stated:

> In order to reach an understanding short of civil litigation, please contact this office within twenty days of the date of this letter.

Tangen wrote his letter of acceptance on October 31, 1979, twenty-two days after the date of Savell's letter.

Defendants contend that the aforementioned passage of Savell's letter, considered by itself, meant that the offer must be accepted within a reasonable period of time, and that the twenty-day period was evidence of what a reasonable time would be. In interpreting an offer we seek to give effect to the reasonable expectations of the offeree. 1 Corbin, Corbin on Contracts § 35, at 143, 145 (1963); *see Beirne v. Alas-*

ka State Housing Authority, 454 P.2d 262, 264 (Alaska 1969). We believe that under a reasonable interpretation of Savell's letter, the offer would expire in twenty days. Since the defendants' acceptance was untimely, the superior court improperly[1] found that the correspondence between Savell and Tangen resulted in an accord and satisfaction.[2]

## II. WASTE

██ An action for waste is sanctioned by AS 09.45.740.[3] Waste occurs when the owner of a possessory estate engages in unreasonable conduct that results in physical damage to the land and substantial diminution in the value of estates owned by others in the same land. See W. Burby, Real Property § 12 (3d ed. 1965); 2 H. Tiffany, Real Property § 630 (3d ed. 1939). Defendants contend that plaintiffs have failed to state a cause of action for waste by not alleging an injury to real property. More specifically, defendants assert that plaintiffs only claim has been that defendants' allegedly unworkmanlike bulk mining activity damaged the removed ore, thereby impairing plaintiffs' royalty interest.

However, by alleging that it was unworkmanlike for defendants to mine a large quantity of ore in a short period of time, plaintiffs have also alleged an injury to real property. The nature of this injury is that the land was left in a greater state of depletion than it would have been if defendants had engaged in workmanlike mining practices. Cf. Schuylkill Trust Co. v. Schuylkill Mining Co., 358 Pa. 535, 57 A.2d 833, 835 (Pa.1948) (waste can occur when unworkmanlike mining operations render irreparable damage to land); Restatement (Second) of Property § 12.2, at 439 (1977) (removal of minerals from leased property is permissible only to the extent that it stays within the limits generally regarded as sound practice). Thus, plaintiffs have alleged a cause of action for waste. The superior court's order dismissing plaintiffs' claim for waste is reversed.

## III. CONVERSION

██ The tort of conversion is defined as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) of Torts § 222A (1965). Conversion can occur when one "intentionally destroys a chattel or so materially alters its physical condition as to change its identity or character." Id. § 226. Plaintiffs contend that defendants have committed conversion by intentionally diluting the ore in order to defeat plaintiffs' right to a forty-five percent royalty interest.

██ In order to maintain a cause of action for conversion the plaintiff must establish that he had a certain possessory interest in the chattel at the time of the wrongful act. See W. Prosser, Law of Torts § 15, at 93–94 (4th ed. 1971). Since the lease

---

**1.** In Wessells v. State, Dep't. of Highways, 562 P.2d 1042, 1046 n. 9 (Alaska 1977), quoting National Bank of Alaska v. J.B.L. & K. of Alaska, Inc., 546 P.2d 579, 586 (Alaska 1976), we said:

> Where the facts relating to surrounding circumstances are not in dispute, interpretation of the words of the contract is treated in the same manner as questions of law, and the standard used in reviewing factual findings is inapplicable.

**2.** The superior court's decision on the issue of accord and satisfaction was the sole basis upon which the court granted attorney's fees to defendants. Since the defendants are no longer the prevailing party on the issue of accord and satisfaction, we need not address defendant's claim that the amount of attorney's fees awarded to defendants was insufficient. Alaska R.Civ.P. 82.

**3.** AS 09.45.740 provides as follows:

> If a guardian, tenant for life or years, or tenant in common of real property commits waste on the property, a person injured by the waste may bring an action for damages for the injury. In an action for waste there may be judgment for treble damages. Where the plaintiff has a reversionary interest and the injury due to waste equals or exceeds the value of the interest held by the one committing the waste, or the waste is committed with malice, judgment may be for forfeiture of the estate and eviction.

provided that plaintiffs "may elect to take this forty-five percent share in cash or in kind" after the ore was eventually refined, plaintiffs claim that they had a future possessory interest in the ore. However, defendants contend that a future possessory interest in a chattel is insufficient to maintain an action for conversion.

Many courts hold that if a plaintiff is neither in possession, nor entitled to immediate possession of a chattel the plaintiff may not maintain an action for conversion. *See generally* W. Prosser, Law of Torts § 15, at 93–95 (4th ed. 1971). However, Prosser soundly criticizes this view, stating as follows:

> Although the distinction persists today in a good many courts, it is an antique procedural survival, with nothing to recommend it. The important fact is that the man entitled only to future possession can recover, in whatever form of action, the full value of his interest in the goods which has been appropriated by the defendant, and no more. If this is not to be called conversion, it is at least the same thing by another name. There are a substantial number of courts which have discarded the procedural distinction, ....

*Id.* at 95–96. The Restatement also advocates that a plaintiff entitled to future possession of a chattel may maintain an action for conversion. *See* Restatement (Second) of Torts § 243 comment b (1965) ("with the disappearance of the forms of action, it is normally of little consequence, except as a matter of pleading in a few jurisdictions, whether this action is now to be called one for conversion or merely for damage to the future interest....").

In light of these considerations, we adopt the view that a future possessory interest is sufficient for a plaintiff to maintain an action for conversion. Since plaintiffs in the case at bar had a future possessory interest in the ore at the time of the alleged conversion, the superior court properly refused to dismiss their action.

## IV. STATUTE OF LIMITATIONS

Defendants contend that plaintiffs' claims of intentional dilution and unworkmanlike mining are essentially tort claims, as opposed to contract claims, and are barred by AS 09.10.070,[4] since plaintiffs filed their complaint more than two years after their cause of action arose. However, even if plaintiffs' claims of intentional dilution and unworkmanlike mining are tort claims, the claims arose out of alleged injuries to plaintiffs' personal and real property, and are governed by AS 09.10.050, which provides in part:

> No person may bring an action (1) upon a contract or liability, express or implied ... (2) for waste or trespass upon real property; or (3) for taking, detaining, or injuring personal property, including an action for its specific recovery, ... unless commenced within six years.

Thus, the superior court properly refused to dismiss plaintiffs' claims.

## V. PIERCING THE CORPORATE VEIL

Two theories may be used to justify disregarding the corporate status of a subsidiary. First, a parent corporation may be held liable for the wrongful conduct of its subsidiary when the parent uses a separate corporate form "to defeat public convenience, justify wrong, commit fraud, or defend crime." *Jackson v. General Electric Co.,* 514 P.2d 1170, 1172–73 (Alaska 1973); *Elliot v. Brown,* 569 P.2d 1323, 1326 (Alaska 1977). Second, a parent corporation may be held liable on the alternative theory that the subsidiary is the mere instrumentality of the parent. *Uchitel Co. v. Telephone Co.,* 646 P.2d 229, 234 (Alaska 1982); *Jackson,* 514 P.2d at 1173. In the latter instance, liability is imposed "simply because the two corporations are so closely

---

4. AS 09.10.070 provides:

No person may bring an action (1) for libel, slander, assault, battery, seduction, false imprisonment, or for any injury to the person or rights of another not arising on contract and not specifically provided otherwise; (2) upon a statute for a forfeiture or penalty to the state; or (3) upon a liability created by statute, other than a penalty or forfeiture, unless commenced within two years.

intertwined that they do not merit treatment as separate entities." *Id.*

 In *Jackson* we stated that the following criteria should be considered to ascertain whether a subsidiary is acting as the mere instrumentality of its parent:

(a) The parent corporation owns all or most of the capital stock of the subsidiary.

(b) The parent and subsidiary corporations have common directors or officers.

(c) The parent corporation finances the subsidiary.

(d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.

(e) The subsidiary has grossly inadequate capital.

(f) The parent corporation pays the salaries and other expenses or losses of the subsidiary.

(g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

(h) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

(i) The parent corporation uses the property of the subsidiary as its own.

(j) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

(k) The formal legal requirements of the subsidiary are not observed.

*Id.* It is not necessary that all eleven of these factors be found in order to pierce the corporate veil. *Id.*

 In plaintiffs' motion for summary judgment on the issue of whether Mohawk Ltd. should be held liable for the wrongful acts of Mohawk Inc., plaintiffs alleged the following uncontroverted facts:

(a) Mohawk Ltd. owns all of the capital stock of Mohawk Inc.

(b) The directors and officers of Mohawk Inc. are the same as those of Mohawk Ltd.

(c) Mohawk Inc. is entirely financed by Mohawk Ltd.

(d) Mohawk Ltd. caused the incorporation of Mohawk Inc.

(e) Mohawk Inc. is grossly undercapitalized. The initial capital contribution to Mohawk Inc. from Mohawk Ltd. was $1,000 and this capitalization figure was never changed. Mohawk Inc. has never made a profit, and has outstanding loans from Mohawk Ltd. in the amount of 2.8 million dollars, which are unsecured, non-interest bearing and with no payback periods.

(f) Mohawk Inc. has no employees.

(g) Mohawk Inc. is a passive corporation and has acquired all of its assets from Mohawk Ltd.

(h) Mohawk Inc. does not have its own letterhead. The offices of Mohawk Inc. and Mohawk Ltd. are commingled. Mohawk Ltd. even used its own name in signing letters assuring plaintiffs that performance under the lease would be satisfactory.

(i) Mohawk Inc. has pledged its assets to secure a bank loan to Mohawk Ltd. Thus Mohawk Ltd. uses the property of Mohawk Inc. as its own.

Based upon the record in this case, we believe that plaintiffs have sufficiently established that Mohawk Inc. was the mere instrumentality of Mohawk Ltd.[5] The superi-

---

**5.** In their opposition motion below, defendants maintained that the following allegations created a dispute over a material issue of fact: minutes are kept of Mohawk Inc.'s formal meetings; Mohawk Inc. has an office of its own in Calgary which is separate and distinct from the main offices of Mohawk Ltd. in Vancouver; and Mohawk Inc. does have employees of its own and has its own letterhead. However, it appears that the hiring of employees, the keeping of minutes, and the use of separate letterhead occurred well after the time of Mohawk Inc.'s allegedly wrongful acts, and are therefore irrelevant. It is unclear from the record when the separate office was established. However,

or court's grant of plaintiffs' motion for summary judgment to pierce the corporate veil of Mohawk Ltd. is affirmed.

## VI. MOTION TO COMPEL ANSWERS TO INTERROGATORIES

Plaintiffs served defendants with interrogatories requesting the following information:

1. For each affirmative defense listed in your answer provide the following information:

(a) The legal theory together with any cite to statutory, rule or case decision which supports the affirmative defense;

(b) Factual information, whether personal or based on information and belief which supports each affirmative defense;

Defendants refused to answer the interrogatories primarily on the ground that the interrogatories requested information privileged under the attorney work product doctrine. For the reasons stated below, we hold that the superior court erred in refusing to compel the defendants to answer the second interrogatory.

Pursuant to Civil Rule 33(b), interrogatories may relate to any matters which can be inquired into under Civil Rule 26(b). Under Rule 26(b), which is patterned after Federal Rule 26, parties may obtain discovery of any unprivileged matter which is relevant to the subject matter involved in the action. However, in ordering discovery, a court "shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or any other representative of a party concerning the litigation." Alaska R.Civ.P. 26(b)[3]. Thus, a party is not required to state what evidence will be relevant, set out his conception of the law as applied to the particular facts, indicate on what legal principles he will rely, or reveal his conception of the strong and weak points of his case. See generally 8 C. Wright & A. Miller, Federal Practice and Procedure § 2167, at 497–98 (1970); see also Ford v. Philips Electronics Instruments Co., 82 F.R.D. 359, 360 (E.D.Pa. 1979). We believe that plaintiffs' first in-

terrogatory, requiring defendants to state the legal theory along with citations to statutes and cases which support their affirmative defenses, clearly requested information protected under the work product doctrine. Thus, the superior court properly refused to compel defendants to answer the first interrogatory.

However, the protection afforded by the work product doctrine as stated in Rule 26(b) must be read in harmony with Rule 33(b), which states that "[a]n interrogatory otherwise proper is not necessarily objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact. . . ." Alaska R.Civ.P. 33(b). Since under Civil Rule 8 the pleadings are called upon only to give notice generally of the issues involved in the case, permitting the discovery of factually oriented opinions and contentions serves to further the purposes of discovery, which are to narrow the issues, obtain evidence for use at trial, and secure information about where and how such evidence can be obtained. See Advisory Committee Notes, 48 F.R.D. 487, 524 (1969); see also 8 C. Wright & A. Miller, Federal Practice and Procedure § 2001, at 15 (1970).

An example of a discoverable factually oriented opinion or contention is found in Hartsfield v. Gulf Oil Corp., 29 F.R.D. 163 (E.D.Pa.1962). The defendant in Hartsfield submitted interrogatories requiring the plaintiff to state in detail the facts upon which his claim of negligence was founded. The court rejected the plaintiffs' contention that the interrogatories were improper as seeking the work product of counsel, and stated the following:

Opinions and conclusions are inherent in any specification of the factual basis of a claim of negligence. The allegation of negligence itself is the statement of a conclusion, and since negligence may be pleaded broadly, a statement of the facts upon which the conclusion is based can hardly be forbidden as the expression of conclusions. Nor is it necessarily improp-

our conclusion would remain unchanged re-

gardless of when the office was established.

er to require conclusions or opinions. The Rules themselves do not preclude it, and to establish such a prohibitory principle would enthrone theoretical considerations of logical symmetry above the practical requirements of everyday litigation. Any denial of interrogatories which are calculated to lead to evidence or to narrow the issues would thwart the purpose of the Rules.

*Hartsfield,* 29 F.R.D. at 164–65 (citation omitted). The principle enunciated in *Hartsfield* has been followed by all of the recent cases. *See generally* 8 C. Wright and A. Miller, Federal Practice and Procedure § 2167, at 502–04 (1970).

▪ Plaintiffs' second interrogatory required the defendants to provide factual information supporting each affirmative defense. Although a specification of facts necessarily requires a party to make opinions and draw conclusions, such opinions and conclusions are factually oriented within the meaning of Civil Rule 33(b), and are therefore not privileged under the work product rule. Accordingly, the superior court's order denying plaintiffs' motion to compel answers to their second interrogatory is reversed.

## VII. PUNITIVE DAMAGES

In their complaint, plaintiffs requested punitive damages for the defendants' purposeful and outrageous conduct, which apparently consisted of intentionally diluting the ore. Defendants moved for summary judgment on the punitive damages claim on the ground that punitive damages are not available in Alaska for a breach of contract. The motion was granted by the superior court.

In *Lull v. Wick Construction Co.,* 614 P.2d 321, 325–26 (Alaska 1980), we stated that it was an open question whether punitive damages may be awarded in a contract action, and noted that some states permit punitive damages when the breach is maliciously or grossly reckless or when the conduct associated with the breach also consti-

tutes an independent tort. We refused to decide the issue in *Lull* because the breach in that case was neither malicious nor tortious in character. *Lull,* 614 P.2d at 326. However, in the case at bar, plaintiffs' claim that defendants intentionally diluted the ore is clearly tortious in character, since the alleged act is the basis of plaintiffs' claim for conversion. *See* Part III *supra.* Thus, the issue is now squarely before us.

▪ According to the Restatement, punitive damages are recoverable for a breach of contract if the conduct constituting the breach is also a tort for which punitive damages are recoverable. *See* Restatement (Second) of Contracts § 355 (1981). We now adopt this view [6] because it furthers our policy of allowing punitive damages for certain tortious acts. *See Bridges v. Alaska Housing Authority,* 375 P.2d 696, 702 (Alaska 1962). Since defendants' alleged conduct also constituted a tort for which punitive damages might have been recoverable, the superior court erred in dismissing plaintiffs' punitive damages claim.

Accordingly, the judgment below is AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

---

**6.** We do not now reach the issue of whether punitive damages are recoverable for a breach of contract if the conduct constituting the breach is malicious but not tortious in character.