**Gerry OSTROW, Appellant,**

v.

**STATE of Alaska, Glen Franklin, Steve Joslin, and Gary Reabold, Appellees.**

No. S-8206.

Supreme Court of Alaska.

Aug. 21, 1998.

Michael A. Stepovich, Stepovich Law Office, Fairbanks, for Appellant.

Raymond M. Funk and Cameron M. Leonard, Assistant Attorneys General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellees.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

## OPINION

COMPTON, Justice.

### I. INTRODUCTION

In March 1995 the State of Alaska, Department of Natural Resources, Division of Forest, Land & Water Management (State) notified Gerry Ostrow that she had sixty days to remove her personal property from land she had previously owned under a contract with the State, but no longer owned after the State terminated the contract. Ostrow failed to remove all of the property within the sixty days. The State and the Division of Forestry (Division) agreed that the Division would remove the property. A contractor hired by the Division removed the property in July 1996. Ostrow filed a tort conversion suit against the State, and sought punitive damages from individual State employees. The State moved for summary judgment. Based on its conclusion that Ostrow did not have a possessory interest in the personal property left on the land after the sixty-day grace period expired in May 1995, the superior court granted the State's motion for summary judgment. Ostrow appeals.

We affirm.

### II. FACTS AND PROCEEDINGS

#### A. The Facts

In April 1982 Charles J. Clark assigned Gerry Ostrow his interest in a land sale contract (Contract) he had entered into with the State. The Contract conveyed nearly eighty acres of agricultural land located on Chena Hot Springs Road. The State approved Clark's sale/assignment to Ostrow. As a condition of the purchase, Ostrow was obligated to "clear the land and bring it into production according to a predetermined schedule."

In September 1989 the Department of Natural Resources (DNR) terminated Ostrow's contract because she had defaulted on her payments and failed to adhere to the development plan requirements. In April 1992 the superior court affirmed the decision of the Commissioner of DNR to terminate Ostrow's contract with the State.

Before DNR terminated the Contract, Ostrow had placed on the property more than 300 pieces [1] of metal culvert, commonly called "multiplate." Ostrow had also placed on the property five cars and trucks and a large fan. In 1995 the State wanted to prepare the land for re-sale, and thus wanted Ostrow to remove the multiplate and other property. On February 28, 1995, the State sent Ostrow a letter by certified mail that reads in its entirety: [2]

> The referenced parcel [ADL 402599—Terminated Agricultural Contract] was recently inspected. Substantial quantities of industrial surplus (i.e., culvert) are located either on the parcel or within very near proximity. Assuming that this material may belong to you and finding that the Superior Court decision of April 21, 1992 did not include notification to remove your personal property from the parcel, we now deliver such notification.
>
> Under the terms of the contract you shall within 60 days of the date of this notice remove all improvements and chattels on the parcel, provided that such removal will not cause injury or damage to the parcel or seriously impair its re-disposal, and is authorized in the State's discretion. Following such removal, you shall leave the parcel in a safe and clean condition acceptable to the department. The time for re-

moval and clean-up may be extended where undue hardship is demonstrated.

Ostrow signed for the letter on March 25. Ostrow, therefore, should have removed the multiplate and all other chattels from the property by no later than May 28, 1995, or she should have requested an extension. Ostrow did not respond to the letter.

Glen Franklin, a State employee, affied that during the fall of 1995 he "made a series of preliminary inquiries . . . as to the value of the multiplate remaining and found that it was likely under $10,000 and most likely of no value, even in the surplus/'junk market.'" On advice of the Attorney General's Office, the State hired appraiser Chris Guinn to inspect the personal property left on the land.

In December 1995 Chris Guinn inspected the multiplate and miscellaneous equipment. Guinn found 300 pieces of metal culvert on the land. He estimated that approximately thirty percent of them were damaged. Further, he opined that, because the metal culverts were so large, "the number of construction projects which would have a need for these items is very limited." He also found on the land five abandoned cars and trucks and a large fan. Based on conversations with people in the business of selling metal culvert, Guinn estimated the total market value of the 300 pieces at $3,000. Guinn estimated that it would cost approximately $500 to remove the abandoned vehicles and fan from the land. Therefore, Guinn concluded that "[a]s a result of my analysis I estimate [that] the market value of all items as of December 1, 1995 is $2,500."

---

1. The only "official" count of the metal culvert (300 pieces) was done by appraiser Chris Guinn in December 1995. This count, however, took place after Ostrow had removed some of it in the spring of 1995, so the exact number of pieces originally left on the property is undeterminable.

2. According to the State, it sent this letter to Ostrow in lieu of relying on paragraph 22(a) of the Contract. Paragraph 22(a) provides:

> The Purchaser shall, within 60 days after termination of the Contract by the Seller or by operation of law, remove all improvements and chattels located on the Parcel, provided that such removal will not cause injury or

damage to the Parcel or seriously impair its re-disposal, and is authorized in the Seller's discretion. Following such removal, the Purchaser shall leave the Parcel in a safe and clean condition acceptable to the Seller. The Seller may, in its discretion, extend the time for removal of the improvements under this subparagraph where undue hardship is demonstrated.

Had the State required Ostrow to remove the multiplate under the terms of the Contract, she would have needed to remove it in June 1992, sixty days from the superior court's decision affirming the termination of the Contract.

Pursuant to Paragraph 22(c) of the Contract, and Guinn's appraisal, the State concluded that it owned the multiplate absolutely. Paragraph 22(c) provides:

(c) Any chattels or improvements having a total appraised value of $10,000.00 or less, as determined by the Seller, and which are authorized for removal by the Seller but are not removed within the time allowed, shall become the absolute property of Seller upon the expiration of the time allowed.

Had Guinn appraised the multiplate as being worth more than $10,000, Paragraph 22(b) of the Contract would have required the State to auction it off and to give the proceeds to Ostrow.[3] In April 1996 the State made arrangements with the Division for removal of the multiplate and other items. The Division contracted with a loader and trucking service for the removal.

During the spring or summer of 1996, before the contractor had begun to remove the multiplate, Ostrow removed some of it from the property. According to Glen Franklin, Ostrow removed approximately 120 of the 300 multiplates.[4] Gary Reabold, a Division employee and defendant, affied that "[t]he process of setting up the removal started before July[;] once out at the site we realized that Ostrow had removed part of the culvert." Upon realizing that Ostrow had removed some of the multiplate, Reabold affied, he became "upset that after the Division of Forestry had contracted to remove these state owned culverts for its use, they had been taken by Ostrow. At this point, we did

**3.** Paragraph 22(b) provides:
If any improvements or chattels are not removed from the Parcel within the time allowed, or are not permitted to be removed from the Parcel by the Seller, they shall, upon 30 days' written notice to the Purchaser, be sold at public auction under the direction of the Seller. The proceeds of sale shall inure to the Purchaser who placed the improvements or chattels on the land, after deduction for the benefit of the Seller of all monies due and owing under this Contract and all expenses incurred in administering the termination and conducting the sale. If there are no other bidders at any such sale, the Seller is authorized to bid on such improvements or chattels. In such event, the Seller shall acquire all

proceed expeditiously to remove the culvert which was in good shape."

### B. *The Proceedings*

In October 1996 Ostrow filed suit against the State and State employees[5] Glen Franklin, Steve Joslin, and Gary Reabold in tort, alleging conversion of the multiplate. In her complaint, Ostrow alleged that the State's actions violated the Uniform Unclaimed Property Act (AS 34.45.010–.780). Ostrow requested damages in the amount of the fair market value of the property. Additionally, Ostrow alleged that the actions of the

Defendants Glen Franklin, Steve Joslin and Gary Reabold amount to willful, wanton, and reckless indifference to the rights of Ms. Ostrow and a conscious action in deliberate disregard of those rights, entitling Plaintiff to an award of punitive damages against the three Defendants in an amount to be proven at trial.

The State denied all wrongdoing, asserted eight affirmative defenses, and counterclaimed, alleging that Ostrow had converted the multiplate that she had removed in the summer of 1996, after it had become the absolute property of the State.

In January 1997 the State moved for summary judgment for itself and its employees, seeking dismissal of Ostrow's claims against it. It argued that, in light of the Contract's terms, there were no genuine issues of material fact and it was entitled to relief as a matter of law. First, the State argued that the Contract's indemnity provision barred Ostrow's claim that the State had converted her property. Second, it argued that the

rights, both legal and equitable, which any other purchaser could acquire by reason of said sale and purchase.

**4.** Both parties state that Ostrow ultimately removed 114 pieces of the multiplate, and the State removed the remaining 186. Because both appear to agree that the State ultimately removed 186 pieces of multiplate, we assume that to be the correct number and not the number referred to by Franklin.

**5.** Glen Franklin is employed by the State, and Gary Reabold and Steve Joslin are employed by the Division. We refer to the three individual defendants collectively as the State's employees.

multiplate was its absolute property, and thus no claim for conversion could lie. Specifically, the State argued that it had sent Ostrow a letter informing her that she needed to remove the multiplate within sixty days; Ostrow failed to remove the property; the State hired an appraiser who appraised the multiplate and other chattels left on the property at approximately $2,500; and, because the property was worth less than $10,000, it became the State's absolutely, pursuant to paragraph 22(c) of the Contract. Lastly, the State argued that punitive damages would be unsupportable because the individual employees did not "display[ ] a callous disregard for the rights of others. [Rather, they] operated reasonably in light of the contract with due care and on the advice [of] the Department of Law."

Ostrow opposed the State's motion and filed a Statement of Genuine Issues. She asserted three genuine issues of material fact. First, Ostrow argued that the Contract could not indemnify the State against claims that the State itself committed a tort. Second, Ostrow argued that the value of the multiplate was in dispute.[6] Lastly, Ostrow asserted that "[t]he affidavits of the defendants reflect that the individual defendants knew that the property was being moved by plaintiff, and that, in spite of this knowledge, they proceeded to surreptitiously remove the property and thwart ongoing efforts by plaintiff to remove it." Furthermore, Ostrow asserted that her attached affidavit [7] "reflect[ed that] it is anticipated that competent evidence of the extraordinary actions by the individual defendants will be established through normal course of discovery which will include their violation of and circumvention of state contracting procedures, and which may further include their individual benefit from the converted property." In the

alternative, Ostrow argued that the resolution of "the punitive damage issue should be held in abeyance pending additional discovery pursuant to Alaska Civil Rule 56(f)."

The superior court heard oral argument on summary judgment in April 1997 and granted the State's motion. This appeal followed.

## III. DISCUSSION

### A. Standard of Review

This court reviews a summary judgment *de novo*. *See Nielson v. Benton,* 903 P.2d 1049, 1052 (Alaska 1995). We will affirm summary judgment if the record presents no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law. *See In re Estate of Evans,* 901 P.2d 1138, 1140 (Alaska 1995). When making those determinations, we draw all reasonable inferences in favor of the non-moving party. *See Bishop v. Municipality of Anchorage,* 899 P.2d 149, 153 (Alaska 1995). Once the moving party has established a prima facie case that there are no issues of material fact, "the non-movant is 'required, in order to prevent entry of summary judgment, to set forth specific facts showing that he could produce admissible evidence reasonably tending to dispute or contradict the [movant's] evidence, and thus demonstrate that a material issue of fact exist[s].'" *Jennings v. State,* 566 P.2d 1304, 1309 (Alaska 1977) (alteration in original) (quoting *Howarth v. First Nat'l Bank of Anchorage,* 540 P.2d 486, 489–90 (Alaska 1975)).

### B. Ostrow Did Not Have a Possessory Interest in the Multiplate at the Time that the State Allegedly Converted It.

"[T]o maintain a cause of action for conversion the plaintiff must establish that

---

**6.** Ostrow affied that she believed the multiplates could have a value in excess of $250,000. She attached two letters to her affidavit, one from K & K Recycling and the other from Airport Equipment Rentals. The letter from K & K Recycling stated that the fair market value of this multiplate is $150 per linear foot. The letter from Airport Equipment Rentals stated that it was interested in buying the culvert for $25 per foot.

In its reply, the State asserts that Ostrow's argument that the appraised value of the multiplate was too low could not create a material dispute because the Contract provides that the

appraised value is to be determined by the Seller, i.e., the State, and there was no dispute that the State had appraised the multiplate at $2,500.

**7.** Ostrow affied that based on her conversations with Ed Anders he would testify that "when [Ostrow] was in the process of removing the multi-plate from the property he had contact with Steve Joslin who was very upset that [Ostrow] was removing [her] property and that he would be sending trucks out immediately to prevent [Ostrow] from continuing."

[she] had a certain possessory interest in the chattel at the time of the wrongful act." *McKibben v. Mohawk Oil Co.*, 667 P.2d 1223, 1228 (Alaska 1983). *See also* Stuart M. Speiser et al., *The American Law of Torts* § 24:2, 711 (1990) ("A plaintiff must demonstrate legal ownership or an immediate superior right of possession to a specific identifiable thing, and, if he cannot, his claim for conversion will fail."). The possessory interest can be the right to immediate possession or the right to future possession of the chattel. *See McKibben,* 667 P.2d at 1229.

On March 25, 1995, Ostrow signed for the letter from the State stating that she had sixty days from receipt of the letter to remove her personal property from the land that she had previously owned. The letter provided that "[t]he time for removal and clean-up may be extended where undue hardship is demonstrated." According to both Ostrow and the State, Ostrow removed some of her personal property during the sixty-day period. When that period ended, she did not request additional time to remove the remaining property from the land. According to Ostrow's deposition, she felt that

> when the State was ready to—to really want that property—to dispose of that property, and when they got serious about cleaning it up, that they would give me— that they would give me adequate notice. They would give me a strong letter of intent on a—on a deadline.... I did not interpret the language to be one that ... I had to—to move as quickly as they said.

Upon expiration of the sixty days, based on Guinn's appraisal, approximately 300 pieces of multiplate, five abandoned vehicles, and a large industrial fan remained on the land. Paragraphs 22(b) and (c) of the Contract either made these items the absolute property of the State, or obliged the State to sell them at auction. Whether the State owned the property absolutely, or was obligated to

auction it and give Ostrow the proceeds, she did not have an immediate or future possessory interest in the property. Once Ostrow failed to remove her property from the land within sixty days,[8] pursuant to the Contract terms, she forfeited her rights to ever again possess the property. Ostrow's lack of possessory interest in the property bars her from maintaining a tort conversion suit against the State.[9]

## IV. CONCLUSION

We AFFIRM the superior court's order granting summary judgment. Ostrow did not have a right to possess any property left on the State's land once the sixty-day removal period expired. Without a right to possess the property, Ostrow cannot sue for conversion of it. Without any genuine issues of material fact in dispute, the State is entitled to judgment as a matter law.

---

8. Arguably, Ostrow no longer had a possessory interest in the property left on the land 60 days after the Contract was terminated—April 21, 1992. However, because the State sent Ostrow a letter specifically granting her 60 days from the date of receipt of the letter to remove her property, we assume that she had until May 1995 to remove the multiplate.

9. Without a possessory interest in the multiplate, and therefore having no basis to maintain a tort conversion suit against the State, Ostrow's other arguments are irrelevant. Significantly, the issue of whether punitive damages could have been appropriate disappears with the tort.