**Jack LARSEN and David
Cooper, Appellants,**

v.

**MUNICIPALITY OF ANCHORAGE,
Appellee.**

No. S–8297.

Supreme Court of Alaska.

Dec. 23, 1999.

---

Kenneth W. Legacki, Anchorage, for Appellants.

Theresa Hillhouse and Ella Anagick, Assistant Municipal Attorneys, and Mary K. Hughes, Municipal Attorney, Anchorage, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, and BRYNER, Justices.

*OPINION*

FABE, Justice.

## I. *INTRODUCTION*

Anchorage police officers Jack Larsen and David Cooper sued the Municipality of Anchorage (MOA) for its failure to assign them to a task force jointly undertaken with the federal Drug Enforcement Administration (DEA). Larsen and Cooper alleged that under their collective bargaining agreement, their supervisor should have made the assignments based on seniority. The superior court granted summary judgment to MOA on the grounds that the officers had not timely challenged the assignments and that the collective bargaining agreement did not require MOA to award the assignments based on seniority. Because we conclude that the officers timely challenged the assignments and that a factual issue exists regarding the necessity of job assignment by seniority, we reverse and remand.

## II. *FACTS AND PROCEEDINGS*

Jack Larsen and David Cooper are senior police officers in the Anchorage Police De-partment. They are employed under a collective bargaining agreement between MOA and the Anchorage Police Department Employees Association (APDEA). They work in the "Metro" unit, which specializes in undercover operations to apprehend drug dealers.

On January 3, 1991, Lieutenant Dan Loy, commander of the Metro unit, made staff assignments for that year. He assigned Larsen and Cooper to "work street corner[s]" focusing on "crack house drug dealers." He assigned two officers with less seniority, Linda O'Brien and Wilbur Hooks, to an Organized Crime Drug Enforcement Task Force known as "Operation Valley Thunder." Loy assigned the junior officers to this joint investigation coordinated by the Anchorage Police Department and the federal DEA, ostensibly because he wanted them to "receive the additional training and expand their abilities as investigators."

Operation Valley Thunder lasted over a year, from January 1991 through February 1992. The assignment required O'Brien and Hooks to move to the Federal Building in Anchorage and to change from an afternoon shift to a morning shift. While assigned to Operation Valley Thunder, O'Brien and Hooks reported to a DEA supervisor.

After Loy made the assignments, Cooper complained to Loy that Loy should have made the assignments based on seniority under the collective bargaining agreement. Although Loy testified that he did not remember this complaint, O'Brien recalled that Loy told her within ten days of the assignment that Cooper and Larsen had objected to the assignment. According to O'Brien, Loy also told O'Brien that he would assign her to Operation Valley Thunder regardless of the senior officers' complaints.

On June 4, 1991, a representative of the police department management, Captain Tom Walker, and a representative of APDEA, Officer Alan Kraft, prepared and signed a memorandum stating that "any and all labor relations complaints of a grievable nature that may arise out of [Operation Valley Thunder] would be placed on hold." The memorandum further provided that the collective bargaining agreement's requirement

that grievances be filed within ninety days would be waived and that "[n]o complaint will be forwarded to the Executive Board of AP-DEA until the completion of this investigation." The purpose of this agreement was to preserve the confidentiality of Operation Valley Thunder. According to both Walker and Kraft, they drafted the memorandum shortly after they first heard oral complaints from Larsen and Cooper about the Operation Valley Thunder assignments.

On November 20, 1991, Larsen and Cooper filed a written grievance, alleging that the Operation Valley Thunder job assignments violated the collective bargaining agreement because they were not based on seniority. As a remedy, they sought the same overtime benefits paid to the assigned officers and asked that Loy follow the seniority requirements of the collective bargaining agreement. Although APDEA initially agreed to represent Larsen and Cooper in arbitration with MOA, the APDEA Executive Board ultimately concluded that the claim lacked merit and decided not to take the grievance to arbitration.

In December 1993 Larsen and Cooper filed a complaint in the superior court seeking compensation from MOA for its failure to assign them to Operation Valley Thunder based on their seniority and from APDEA for its failure to represent them in their grievance against MOA. In November 1995 Larsen and Cooper stipulated to dismissal of the claims against APDEA.

In April 1997 MOA filed two motions for summary judgment that are at issue in this appeal. First, it moved for summary judgment on the ground that Larsen and Cooper had not timely grieved the Operation Valley Thunder assignments. Second, it moved for summary judgment on the ground that the collective bargaining agreement did not re-quire that the Operation Valley Thunder assignments be based on seniority. Superior Court Judge Peter A. Michalski granted both motions and awarded $31,008.20 in attorney's fees to MOA. Larsen and Cooper appeal the superior court's decision granting summary judgment and its award of attorney's fees.

## III. DISCUSSION

### A. Standard of Review

We will affirm a superior court's grant of summary judgment "if the evidence in the record presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[1] "The moving party bears the burden of demonstrating that there is no dispute as to any issue of material fact."[2] We will draw all reasonable inferences of fact in favor of the nonmoving party.[3]

This appeal also requires us to interpret a collective bargaining agreement. Contract interpretation presents a question of law that we review de novo.[4] "When interpreting contracts, the goal is to 'give effect to the reasonable expectations of the parties.'"[5] "In determining the intent of the parties the court looks to the written contract as well as extrinsic evidence regarding the parties' intent at the time the contract was made."[6] "Where there is conflicting extrinsic evidence the court, rather than the jury, must nonetheless decide the question of meaning except where the written language, read in context, is reasonably susceptible to both asserted meanings."[7]

### B. The Grievances Were Timely as a Matter of Law.

The superior court granted summary judgment to MOA on the ground that Larsen and

1. *Andrews v. Wade & De Young, Inc.,* 950 P.2d 574, 575 (Alaska 1997).

2. *Id.*

3. *See id.*

4. *See Alaska Housing Fin. Corp. v. Salvucci,* 950 P.2d 1116, 1119 (Alaska 1997).

5. *Stepanov v. Homer Elec. Ass'n,* 814 P.2d 731, 734 (Alaska 1991) (quoting *Mitford v. de Lasala,* 666 P.2d 1000, 1005 (Alaska 1983)).

6. *Municipality of Anchorage v. Gentile,* 922 P.2d 248, 256 (Alaska 1996).

7. *Johnson v. Schaub,* 867 P.2d 812, 818 (Alaska 1994) (quoting *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.,* 778 P.2d 581, 584 (Alaska 1989)).

Cooper failed to timely challenge the Operation Valley Thunder assignments.[8] The collective bargaining agreement in effect during the times relevant to this appeal required that grievants report complaints to a shop steward or APDEA representative who would "attempt to resolve the matter by consulting with the employee's shift supervisor." If the steward or representative could not resolve the matter in this informal manner, the agreement required the representative to present the matter in writing to the chief of police within ninety calendar days from the date of the occurrence upon which the grievance was based. Lieutenant Loy made the disputed assignments on January 3, 1991. The official ninety-day deadline was therefore on April 3, 1991. Yet the plaintiffs failed to file a grievance until November 20, 1991.

To justify their failure to meet this deadline, Larsen and Cooper respond that, in a June 4, 1991 memorandum, the police department management and APDEA representatives waived the ninety-day requirement for "any and all" grievances arising out of Operation Valley Thunder. Addressed to then Chief of Police Kevin O'Leary, the memorandum stated:

> After our discussion with Fred Thomas of D.E.A. regarding his concerns about the security of the above investigation, we had a meeting with the Metro Unit. As a result of that meeting, *it was decided by all members of the unit that any and all labor relations complaints of a grievable nature that may arise out of this investigation would be placed on hold.* No complaint

will be forwarded to the Executive Board of APDEA until the completion of this investigation. The incidents will be documented by a memo to Capt. Walker and to Off. Kraft. *The 90 day requirement for filing of grievances will be waived.* There will [be] no accrual of retroactive benefits as a result of this agreement. This agreement is not precedent setting, nor will it establish "Past Practice" issues.

> The purpose of this agreement is not to avoid compliance with the existing contract between the Municipality of Anchorage and APDEA, but to allow a sensitive investigation to proceed, and still maintain the rights of the officers involved.

(Emphasis added.) The collective bargaining agreement permitted the parties to modify the deadlines for filing grievances in this manner:

> The failure of either party to follow the above time limits shall result in resolution of the grievance against the party failing to meet the time limits. *The parties may mutually agree in writing to modify the time limits* in any step of the Grievance Procedure.

(Emphasis added.)

■ The critical issue, then, is whether the June 4 memorandum applied to all grievances arising out of Operation Valley Thunder or just those complaints arising after the police department management and APDEA executed the memorandum. The superior court concluded as a matter of law that the authors of the memorandum—representa-

8. MOA concedes that this claim under the collective bargaining agreement is actionable, even though Larsen and Cooper never demonstrated that the union breached its duty to represent them fairly in the grievance procedures. Under federal labor law, an employee must show such a breach before the employee may directly sue his employer for wrongful discharge. *See Vaca v. Sipes,* 386 U.S. 171, 186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

We declined to adopt this rule in Alaska in wrongful discharge cases because an Alaska citizen has a "sufficient property interest" in continuing employment to raise due process concerns. *Casey v. City of Fairbanks,* 670 P.2d 1133, 1138 (Alaska 1983). Requiring an employee to prove a breach of the duty of fair representation in such cases would deprive the employee of

"any review of the decision to terminate him unless he were able to prove that the Union acted wrongfully in refusing to process his grievance." *Id.* Because the Union's decision could be "erroneous without being arbitrary, discriminatory or in bad faith," we reasoned that this requirement places too great a burden upon an employee's right to due process. *Id.* We did not decide in *Casey,* however, whether we would adopt the federal rule for other types of claims covered by a collective bargaining agreement.

Here, MOA does not argue that the rule in *Casey* should be limited to significant employment actions, such as termination, rather than allowing an employee to take any grievance under a collective bargaining agreement directly to court. Accordingly, we do not address the issue at this time.

tives from APDEA and the police department—did not intend the waiver to apply retroactively. We disagree.

First, the agreement itself contains no language limiting its application to prospective grievances. The memorandum memorializing the agreement states that for "any and all" grievances arising out of Operation Valley Thunder, "[t]he 90 day requirement for filing of grievances will be waived." Second, the timing and course of events leading to the memorandum of agreement indicate that the memorandum was indeed a response to Larsen and Cooper's complaints and that the police department intended it to cover Larsen and Cooper's complaints.

■ In support of its argument that the waiver of the ninety-day requirement did not cover Larsen and Cooper's grievance, MOA relies heavily on the testimony of MOA and APDEA representatives regarding their subjective intent in crafting the memorandum of agreement. For example, Captain Walker maintained in an affidavit that "[t]here was no mutual agreement between APDEA and the Municipality by this memo to excuse any untimely filing of a grievance related to Operation Valley Thunder case assignment that may have been required to have been filed in early April, 1991...." But while we strive to give effect to the intention of the parties to a contract, "looking to their testimony as to their subjective intentions or understandings will normally accomplish no more than a restatement of their conflicting positions."[9] Instead, we will look to "express manifestations of each party's understanding of the contract in attempting to give effect to the intent behind the agreement."[10] Both Captain Tom Walker and Officer Alan Kraft, the drafters of the memorandum, agreed that "[t]he June 4, 1991 memo was drafted because [they] had just heard oral complaints a few days before from Officers Larsen and Cooper regarding the assignment of officers to the DEA/APD Operation Valley Thunder Drug Task Force."

Moreover, Larsen and Cooper "were asked to keep the grievance secret until the matter could be heard later so as not to compromise the Task Force." Cooper's deposition testimony asserts that he and Larsen did speak to a steward and attempt to file a grievance:

We got a shop steward, we talked about it, filed a grievance. During the course of Valley Thunder operation, while it was going on, Captain Walker came to the unit, told us the chief was displeased with us because we filed a labor action. Fred Thomas, who was the local administrator of the Drug Enforcement Administration, had threatened to kick everybody—everybody being the Anchorage Police Department—out of the task force, because he felt that by us filing a grievance, we [were] jeopardizing the integrity of the task force....

At that point we agreed. Al Kraft showed up. I believe he was the president at the time. So we negotiated [that] we would suspend the grievance until after the case was concluded.

Thus, it is evident from both the waiver language and the extrinsic evidence that the June 4, 1991 memorandum's purpose was to prevent Cooper and Larsen's grievance from becoming public and compromising the security of the covert operation. Because the record does not show that any other employees filed a grievance based on the operation, there is no basis for thinking that the memorandum had any purpose other than to address Larsen and Cooper's complaints.[11]

Larsen and Cooper also point to MOA's actions, which can only be reasonably interpreted as suggesting that MOA believed the complaint was not time barred. MOA did not object to the grievance as untimely before it scheduled an arbitration hearing on the matter;[12] indeed, MOA's conduct in set-

9. *Day v. A & G Constr. Co., Inc.,* 528 P.2d 440, 444 (Alaska 1974).

10. *Peterson v. Wirum,* 625 P.2d 866, 870 (Alaska 1981).

11. Although Larsen and Cooper may not have filed a formal grievance within 90 days, the for-

mer MOA director of management services, Neil Koeniger, noted that the grievance process was informal and that "there are often no series of correspondence or notices regarding issues."

12. The scheduled arbitration never actually took place because APDEA decided that the grievance lacked merit.

ting and confirming the arbitration dates implies that MOA intended the memorandum to waive the normal ninety-day deadline for all claims pertaining to Operation Valley Thunder.

In light of the language of the memorandum of agreement and the virtually undisputed evidence on this issue, we conclude as a matter of law that the grievances were timely.

### C. A Genuine Issue of Material Fact Exists as to Whether the Assignment Should Have Been Based on Seniority.

Larsen and Cooper argue that three separate provisions of the collective bargaining agreement required MOA to make the Operation Valley Thunder assignments on the basis of seniority. They point to the agreement's provisions on job assignments, shift changes, and overtime. The trial court granted summary judgment on all three claims. We review each claim in turn.

#### 1. Article IX, § 7: job assignments

Larsen and Cooper argue that because the Operation Valley Thunder assignments were job assignments, Loy should have made them according to seniority. Article IX, § 7 of the collective bargaining agreement requires that job assignments be made on the basis of seniority and defines the term "job assignment" as "the transfer of an employee from one section or division to another."[13] Both the APDEA Executive Board and MOA, the actual parties to the collective bargaining agreement, claim that the Operation Valley Thunder placements were not job assignments.

MOA maintains that the term "job assignment" in Article IX, § 7 refers only to transfers *within* the Anchorage Police Department. Because the officers assigned to Operation Valley Thunder also "continued to work on case assignments from the APD Metro Section in addition to their case assignment to Operation Valley Thunder," MOA contends that they were not transferred and that their assignment to the new operation did not constitute a "job assignment" under the agreement. But to the extent that this is evidence of MOA's subjective intent, it is of little value as it "reflects only a restatement of [its] position in this litigation to which little, if any, weight should be given."[14]

The vice president of APDEA explained in his deposition that the APDEA Executive Board felt "it was not a job assignment but more of a case assignment." But this testimony was provided to explain why APDEA decided not to take the officers' grievance to arbitration, and did not address APDEA's intent in drafting or agreeing to the contract term. On the other hand, evidence that the officers continued to be treated as members of the narcotics enforcement section is probative of MOA's position.

Larsen and Cooper cite various instances in the record where the term "job assignment" is used with reference to special task force assignments. In evaluating the performance of an officer assigned to a DEA Drug Enforcement Task Force in Anchorage, MOA referred to his position as a "job assignment." Gerald Weeks, who replaced Loy as Metro command officer, also stated his belief that the Operation Valley Thunder placements were job assignments and that Cooper and Larsen "should have been appointed to the Task Force if they had more seniority than [Hooks and O'Brien]." When deposed, Loy, the officer who made the assignments, used the description "job assignment" in reference to Operation Valley Thunder.

---

13. Article IX, § 7 provides in its entirety:

Job assignments shall be made on the basis of qualifications. Qualifications being equal, job assignments shall be made on the basis of position seniority. For the purpose of this Section, job assignment is defined as any transfer of an employee from one section or division to another. Job assignments shall initially be offered within the division in which the vacancy occurs. If positions cannot be filled by job assignment within a division, they shall be filled on a department-wide basis. Any disputes arising from job assignments shall be subject to the Grievance Procedure.

14. *Western Pioneer, Inc. v. Harbor Enters., Inc.,* 818 P.2d 654, 657 (Alaska 1991); *see also Peterson v. Wirum,* 625 P.2d at 870.

But it is not clear that each cited use of the term "job assignment" is tied to the Article IX, § 7 definition of that term. For example, the performance evaluation relied upon by Larsen and Cooper states that the officer "has performed his job assignments as a Detective with the Anchorage Police Department in an acceptable manner...." This use of the term may simply equate "job assignment" with "task," rather than an inter-division or section transfer. Similarly, Loy's reference to "a job assignment directed to my unit" was equated with "those tasks that were given to me to fill." But Weeks refers to "job assignments" in the narrow contract sense and supports appellants' position.

Furthermore, appellants submitted documentary evidence including a series of grievance decisions indicating that assignments to special task forces were considered "job assignments" in the contract sense. These documents may reflect a course of performance or special usage that may be of considerable value in deciding what the contract means.[15]

On the record before us, the meaning of the term "job assignment," defined in the contract as a transfer from one section or division to another, is uncertain. Just what a "transfer" is within the meaning of the contract is unclear. Whether Hooks and O'Brien were transferred to a new section or division and thus received new job assignments is a question that is partly fact dependent. As the facts before us point in conflicting directions, we conclude that the determination of this question requires additional litigation.

---

**15.** *See* Restatement 2d Contracts § 202(4) and (5).

**16.** Larsen and Cooper primarily rely on the deposition testimony of Officer O'Brien. O'Brien stated that when she was assigned to Operation Valley Thunder, her "shift changed from afternoons to mornings." MOA contends that we should not consider this testimony because Larsen and Cooper did not present it before the superior court granted summary judgment. Because we conclude that no genuine issue of material fact exists even with this testimony, we need not address the issue.

## 2. *Article IX, § 5: shift preferences*

■ Larsen and Cooper contend that the Operation Valley Thunder assignments should have been based on seniority because they entailed "shift changes."[16] Article IX, § 5 of the agreement provides that seniority must govern "[f]or purposes of shift preference" and that shift changes "will be allowed at the beginning of each quarter," as long as an employee makes a timely request.[17] The superior court determined the assignments to Operation Valley Thunder did not qualify as shift changes because supervisors need only honor officers' shift preferences at the beginning of each quarter. For this reason, the superior court concluded that any changes in shift resulting from the Operation Valley Thunder assignment did not fall within the seniority requirements of Article IX, § 5 of the collective bargaining agreement. The court reasoned that the shift preference provision applied only to a quarterly process in which APD officers bid on different shifts. We agree.

It is undisputed in the record before us that the Operation Valley Thunder assignments do not represent the kind of shift changes contemplated by the plain language of Article IX, § 5 of the agreement. Instead, § 5 refers to honoring the shift preferences of officers at the beginning of each quarter when schedules are set. Thus, we conclude that the superior court properly found that Operation Valley Thunder did not qualify as a shift change under Article IX, § 5.

## 3. *Article IX, § 6: overtime*

■ The officers contend that because Operation Valley Thunder potentially involved overtime work, Loy should have made

---

**17.** Article IX, § 5(a) provides in its entirety:

For purposes of shift preference, days off, layoff, and rehire, position seniority shall govern. For the purposes of preference of days off and preference of shifts, position seniority will prevail and changes will be allowed at the beginning of each quarter if the requested change is made by the fifteenth (15th) day of the preceding month and will be allowed within position classification. The change of days off and shifts other than at the beginning of each quarter shall be allowed with the approval of the Association and the Chief of Police.

the assignments on the basis of seniority. MOA responds that Article IX, § 6 refers only to "special events overtime" for work at such events as Fur Rendezvous, hockey games, or concerts. According to MOA, § 6 does not govern work performed as part of an officer's regular assignment that happens to have irregular hours, such as Operation Valley Thunder.

Article IX, § 6 provides that "[a]ll work performed outside of the regularly scheduled workday shall be on a position seniority basis. . . . *These special assignments* will be posted no less that four (4) days *prior to the event,* where possible." (Emphasis added.) The agreement's use of the terms "special assignment" and "event" in § 6 supports MOA's interpretation. Although the officers assigned to Operation Valley Thunder may have been required to work different hours than other officers in the Metro unit, their assignment was not to a special event scheduled outside the regular workday.

Moreover, as MOA notes, if § 6 were read to require seniority to govern whenever the *potential* for overtime exists, management of the department would be difficult at best. The vice president of APDEA articulated this concern:

> [T]here was an overriding feeling that if every assignment that was given out within a section was based on the amount of potential overtime that could maybe be made, it would be impossible, really, to run the department and to manage the way we just go about doing our jobs. And it would be a real can of worms in terms of the everyday functions, not to mention the intent of the language there.

Thus, we uphold the superior court's grant of summary judgment on this issue.

## IV. *CONCLUSION*

We conclude that the officers timely challenged the assignments and that whether Operation Valley Thunder was a job assignment governed by seniority presents a material issue of fact. Thus, we REVERSE and

REMAND to the superior court for further proceedings consistent with this opinion.[18]

CARPENETI, Justice, not participating.

---

**18.**  Larsen and Cooper also dispute the award of attorney's fees to MOA. But because we are re-

manding the case for further proceedings, we need not address this issue.