**SPRUCEWOOD INVESTMENT CORPO-RATION, and Northern Construction & Equipment Company, Appellants,**

v.

**ALASKA HOUSING FINANCE CORPORATION, Appellee.**

No. S–9371.

Supreme Court of Alaska.

Oct. 19, 2001.

**12.** *Id.* at 509.

**13.** *Id.*

**14.** *See id.*

Michael R. Wirschem, Law Office of Paul D. Stockler, Anchorage, for Appellant Sprucewood Investment Corporation.

Frederic E. Brown, Fairbanks, for Appellant Northern Construction & Equipment Company.

Steven D. DeVries, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

### I. INTRODUCTION

The main question presented in this case is how to interpret a "demolition" contract. In isolation, the contract might be interpreted to permit the removal and sale of buildings, but at the time the contract was made, both parties actually believed that it required the buildings' destruction. Because a contract is interpreted in accordance with the parties' intent at the time of contracting, we conclude that the demolition contract required the buildings' actual destruction.

### II. FACTS AND PROCEEDINGS

In early 1997 Alaska Housing Finance Corporation ("AHFC") created a development plan for the revitalization of Spruce Park, a low-income housing facility in Fairbanks owned and operated by AHFC. The plan called for selling seven buildings, demolishing fifteen others, and constructing new housing on the cleared land. AHFC chose to demolish some of the buildings rather than rehabilitate them because refurbishing the buildings to AHFC's health and safety standards was not deemed to be cost-effective.

In February 1998 AHFC issued an "Invitation to Bid" on the Spruce Park project. The Invitation to Bid was entitled "Bid Packet to Demolish a Portion of the Spruce Park Project." The bid packet's "General Description" of the work stated that: "[The buildings] will have asbestos floor tile and mastic removed and the buildings and foundations will be completely razed. All debris will be removed from the site . . . ." The packet's General Description referenced two subsequent sections in the packet, one of which—section 02055—was to apply if the contractor demolished the building with the asbestos-containing materials left in place.[1] Section 02055 described the "Scope of the Work" as "the removal and satisfactory disposal of all buildings," and the section's General Description again repeated that "the buildings and foundations will be completely razed."

Section 02055 also included a salvage provision, which stated that "[r]emoved items will become the property of the Contractor." After one of the prospective contractors asked if AHFC would permit the buildings to be cut into large pieces and removed to a different location for salvage, AHFC attached an addendum to the bid packet that stated that "The disposal of the building materials is at the contractor's discretion."

As provided for in the Invitation to Bid, AHFC held a prebid conference on February 17, 1998, to address questions from prospec-

---

1. Section 02085 contained detailed specifications governing the removal of asbestos-containing materials "prior to building demolition."

tive bidders about the contract's requirements. AHFC employee Steven Pannone advised the bidders that:

> All those buildings back behind us get[ ] razed, get[ ] razed. We're looking for the buildings to be completely demolished, utilities capped at the surface. Any overhead power lines pulled back to the pole. There is asbestos containing material in the buildings. The—we made an arrangement with the landfill people that if—you can either take the material out separately or take the whole building down and take the asbestos material over with the building material.

Northern Construction and Equipment's president, Gerald Timmons, participated in the conference. After Pannone described the nature of the project and another contractor asked if the utility poles were to be left standing, Timmons asked Pannone whether the utilities were to be capped at the surface or back at the main.

Northern Construction put in a bid of $148,400 on the project, which was the lowest bid. Prior to issuing the "Notice of Intent to Award" the contract to Northern Construction, AHFC's Procurement Officer, Gloria Dunmore, contacted Timmons to discuss the contract's requirements. Dunmore advised Timmons that if Northern Construction did not intend to demolish the buildings, it would not be awarded the contract. According to Dunmore and AHFC Construction Coordinator Dave Gonzales, Timmons agreed to demolish the buildings. Before Northern Construction was awarded the contract on March 31, 1998, Gonzales and AHFC Engineer Steven Pannone talked with Timmons over the phone. Timmons asked if the contract would permit Northern Construction to remove the buildings intact from the site and sell them. Timmons was told that Northern Construction was required to "completely demolish" the buildings, and could not sell them.

Timmons has admitted that at the time he bid on the contract, it was not his intention that the buildings be left standing at any location following his salvage operations. Instead, he intended to "crush" the parts of the buildings that were not cost-effective to remove, and take them to the dump. Ultimate-

ly, however, Timmons decided to remove the buildings and sell them rather than destroy them. One question in this case is when Timmons changed his mind.

Northern Construction's own brief suggests that Timmons did not decide to remove and sell the buildings until after Northern Construction had been awarded the contract:

> After Northern was awarded the contract, [Timmons] learned that one of the other bidders had planned, if successful, to move the buildings off the site and salvage them. After considering this for a time Timmons made an agreement with Sprucewood that Northern would sell them the buildings after they'd been salvaged. Both he and Hugh Ashlock of Sprucewood were relying on the salvage provisions in the contract.

In his deposition testimony, moreover, Timmons testified that he did not consider removing the buildings intact until after he learned that some of the other contractors had planned to do so. Because Timmons did not learn that any of the other bidders had planned to move the buildings off site instead of destroying them until after Northern Construction had been awarded the contract, Timmons could not have formed his intention to remove the buildings intact and sell them until after the contract was awarded.

Northern Construction was awarded the contract on March 31, 1998, and was issued a "Notice to Proceed" on April 1, 1998. The contract required "substantial completion" of the entire project 120 calendar days following the date of the notice to proceed. On April 24, 1998, Northern Construction sent AHFC a letter requesting permission to move the buildings off site for demolition. On April 30, 1998, Northern Construction sent a second letter, asking for AHFC's "non-objection" to sell the buildings intact after moving them off site. AHFC replied on May 4, 1998, noting that "Every building specified for demolition in the contract must be completely demolished within the allotted contract time," and referencing section's 02055's requirement that "the buildings and foundations be completely razed."

On May 18, however, Northern Construction began negotiating the sale of the build-

ings to Sprucewood Investment Corporation. During the negotiations, Northern Construction informed Sprucewood that AHFC was contesting its right to salvage the buildings, although Northern Construction downplayed the seriousness of AHFC's concerns. On June 20, 1998, Northern Construction sold the buildings to Sprucewood for $150,000 plus costs.

In subsequent letters to AHFC, Northern Construction asserted that "[d]ealing with the buildings off-site is a secondary priority," and that "[t]he secondary issue of off-site salvage should not be cause for stopping work." Not knowing that the buildings had already been sold, AHFC repeatedly requested confirmation that Northern Construction was planning to demolish the buildings. On July 10 Timmons sent a letter to AHFC stating that Northern Construction did not plan to " 'raze each building' in a destructive manner," and that instead the buildings would be available for "total salvage." AHFC expressed concern over Northern Construction's intent not to " 'raze each building' in a destructive manner" and requested clarification of Northern Construction's plans.

On July 27 AHFC asked Northern Construction to provide "unequivocal confirmation," by the next day, that the buildings would be completely demolished as required by the contract. Northern Construction asked for ten days to respond. On July 29, however, AHFC learned that the buildings had already been sold to Sprucewood. AHFC then sought and, on August 20, 1998, received a temporary restraining order barring Northern Construction and Sprucewood from doing anything with or to the buildings except as necessary to comply with Northern Construction's contractual obligations to raze the buildings.

Subsequently, Superior Court Judge Richard D. Savell granted summary judgment on AHFC's breach of contract claims against Northern Construction. At the same time, Judge Savell granted summary judgment dismissing Sprucewood's counterclaims against AHFC for negligence and economic waste, and dismissing Northern Construction's counterclaims against AHFC for negli-

gence, breach of contract, and breach of the implied covenant of good faith and fair dealing.

Judge Savell also issued an order granting AHFC's motion for access to property, allowing AHFC to demolish the buildings at their current location or remove them for disposal as AHFC saw fit. Sprucewood requested a stay of proceedings, which Judge Savell granted contingent upon Sprucewood's securing and filing proof of $10,000,000 all risk liability insurance. Sprucewood apparently never obtained this insurance, and so the stay was dissolved on November 8, 1999, and AHFC took possession of the buildings.

Rather than demolish the buildings, AHFC agreed to sell them to Jalasco Investments, following a competitive bidding process, for $210,125. Judge Savell denied Sprucewood's Civil Rule 60(b) motion for relief from final judgment. Judge Savell concluded that because Northern Construction had breached its contract, Sprucewood had acquired no interest in the buildings, and AHFC's right to insist that its buildings be demolished in accordance with the contract did not prohibit it from choosing not to demolish them once the contract had been breached.

Sprucewood and Northern Construction appeal the court's issuance of the temporary restraining order, the court's grant of summary judgment in favor of AHFC on its breach of contract claim, the court's grant of summary judgment against Northern Construction on its breach of contract counterclaim, and the court's grant of summary judgment against Sprucewood and Northern Construction on their negligence and economic waste counterclaims. Because Northern Construction has essentially adopted Sprucewood's presentation of the case, and because the identity of the parties does not affect our conclusions, the appellants will be referred to collectively as "Sprucewood."

III. *STANDARD OF REVIEW*

■ This court applies an abuse of discretion standard in reviewing an order granting

a temporary restraining order,[2] and in reviewing an order denying a motion for relief from judgment under Civil Rule 60(b).[3]

 This court reviews the superior court's grant of summary judgment de novo, determining whether any issues of material fact exist and whether the moving party is entitled to judgment as a matter of law.[4] On a breach of contract claim, "[s]ummary judgment is inappropriate where the evidence before the trial court establishes that a genuine factual dispute exists as to the parties' intent."[5] Where there is no conflicting extrinsic evidence as to the parties' intent, however, "questions of interpretation of the meaning of written documents are treated as questions of law for the court."[6]

## IV. DISCUSSION

### A. Is Sprucewood's Appeal of the TRO Moot?

As a preliminary matter, Sprucewood appeals the superior court's grant of a temporary restraining order, essentially arguing that Judge Savell erred in granting the TRO because he improperly interpreted the contract. But AHFC argues that its sale of the buildings to Jalasco Investments has rendered Sprucewood's appeal of the TRO moot, as Sprucewood would not be able to do anything with or to buildings Sprucewood does not own even if this court reversed the grant of the TRO. In reply, Sprucewood argues that the sale of the buildings to Jalasco Investments has not rendered all of the legal issues in the case moot, as "the legal issue of

whether AHFC owed NCE and Sprucewood money for damages ... is far from moot."

 This court will "refrain from deciding questions 'where the facts have rendered the legal issues moot.'"[7] "A case is moot if the party bringing the action would not be entitled to any relief even if they prevail."[8] We have noted that "Alaska Civil Rule 65(b) states that a TRO expires by its own terms within 10 days unless the restrained party agrees to an extension and the reasons for extension are entered of record."[9] Judge Savell entered a temporary restraining order pending "a trial on the merits or determination of a preliminary injunction." The TRO has long since expired and does not constrain Sprucewood's freedom of action. Because Sprucewood does not need, and thus could not receive, relief from the TRO, its appeal of the TRO is moot.

Our conclusion would be no different if the superior court had entered a preliminary injunction instead of a TRO. We have previously held that a dispute is technically moot where a party has "submitted to an order by the superior court, the effects of which cannot be undone."[10] Sprucewood does not deny that it complied with the terms of the court's restraining order, or that it no longer has possession of the buildings. A reversal of the restraining order would not enable Sprucewood to do anything to the Spruce Park buildings, as they are now owned by Jalasco Investments. As the effects of the superior court's order cannot be undone, Sprucewood's appeal of the order is moot.[11]

---

2. See State v. Kluti Kaah Native Village, 831 P.2d 1270, 1272 n. 4 (Alaska 1992).

3. See DeVaney v. State, Dep't of Revenue, CSED ex rel. DeVaney, 928 P.2d 1198, 1199–1200 (Alaska 1996).

4. See Alaska Tae Woong Venture, Inc. v. Westward Seafoods, Inc., 963 P.2d 1055, 1065 n. 4 (Alaska 1998).

5. Neal & Co., Inc. v. Association of Village Council Presidents Reg. Hous. Auth., 895 P.2d 497, 502 (Alaska 1995).

6. Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist., 778 P.2d 581, 584 (Alaska 1989).

7. Hayes v. Charney, 693 P.2d 831, 834 (Alaska 1985) (quoting Doe v. State, 487 P.2d 47, 53 (Alaska 1971)).

8. Maynard v. State Farm Mut. Auto. Ins. Co., 902 P.2d 1328, 1329 n. 2 (Alaska 1995).

9. Ostrow v. Higgins, 722 P.2d 936, 939 (Alaska 1986).

10. Municipality of Anchorage v. Anchorage Daily News, 794 P.2d 584, 588 (Alaska 1990).

11. See Honig v. Students of the California Sch. for the Blind, 471 U.S. 148, 149, 105 S.Ct. 1820, 85 L.Ed.2d 114 (1985) (per curiam) (holding appeal moot where tests that had been ordered under the preliminary injunction had already been car-

■ Although Sprucewood concedes that it complied with the terms of the TRO, it insists that the TRO ruling cannot be moot because Sprucewood still possesses viable damages claims against AHFC. But Sprucewood confuses the survival of its case with the survival of an issue in its case. Compliance with a preliminary injunction does not moot a party's damages claims, only an appeal from the injunction.[12] Sprucewood's damages claims can be adequately addressed in Sprucewood's appeal from the superior court's grant of summary judgment, so the existence of those claims does not save Sprucewood's appeal of the TRO from mootness.

B. *Did the Superior Court Err in Granting Summary Judgment on AHFC's Breach of Contract Claims Against Northern Construction?*

1. *Did the superior court err in concluding that the contract called for the demolition, rather than removal and sale, of the Spruce Park buildings?*

Sprucewood's main argument is that Judge Savell erred in granting summary judgment on AHFC's breach of contract claims, because Sprucewood presented extrinsic evidence—of other bidders' intentions to remove and sell the buildings, of trade practice consistent with the removal and sale of buildings scheduled to be "demolished," and of AHFC's employees' concessions that the contract did not specify how the buildings were to be demolished—which raised a material issue of fact as to Northern Construction's

"reasonable expectations" in entering into the demolition contract. In reply AHFC argues that Sprucewood's extrinsic evidence does not create a material issue of fact, as the undisputed evidence is that, at the time of contracting, both AHFC and Northern Construction understood the contract to require the complete destruction of the Spruce Park buildings.

■ "In interpreting the provisions of a contract, it is the duty of the courts to ascertain and give effect to the intentions of the parties."[13] To determine the intentions of the parties, we look not only to the written contract, but also to extrinsic evidence regarding the parties' intent at the time the contract was made.[14] Because the parties' testimony as to their subjective intentions or understandings will normally accomplish no more than a restatement of their conflicting positions,[15] this court will generally look instead to "express manifestations of each party's understanding of the contract in attempting to give effect to the intent behind the agreement."[16]

■ As a matter of law, "[w]hen, at the time of formation, the parties attach the same meaning to a contract term and each party is aware of the other's intended meaning, or has reason to be so aware, the contract is enforceable in accordance with that meaning."[17] Because it is the intent of the parties that governs the court's interpretation of a contract, a party will thus be "bound not by the outer limits of an ambiguous document, but by the terms agreed upon by the parties."[18] The key question in this

---

ried out); *University of Texas v. Camenisch,* 451 U.S. 390, 398, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ("[T]he question whether a preliminary injunction should have been issued here is moot, because the terms of the injunction ... have been fully and irrevocably carried out.").

12. *See, e.g., Harris v. Blue Cross Blue Shield of Missouri,* 995 F.2d 877, 879–80 (8th Cir.1993).

13. *AMFAC Hotels v. State, Dep't of Transp. & Public Facilities,* 659 P.2d 1189, 1194 (Alaska 1983), *overruled on other grounds by Atlantic Richfield Co. v. State,* 723 P.2d 1249, 1252 (Alaska 1986).

14. *See Municipality of Anchorage v. Gentile,* 922 P.2d 248, 256 (Alaska 1996).

15. *See Larsen v. Municipality of Anchorage,* 993 P.2d 428, 433 (Alaska 1999).

16. *Id.* (*quoting Peterson v. Wirum,* 625 P.2d 866, 870 (Alaska 1981)).

17. 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.5, at 16 (rev. ed.1998); *see also* Restatement (Second) of Contracts § 201(1) (1981) ("Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.").

18. *Kilmer v. Dillingham City Sch. Dist.,* 932 P.2d 757, 765 (Alaska 1997).

case, then, is what meaning the parties attached to the terms of the demolition contract at the time the contract was made.

Sprucewood does not seriously dispute AHFC's claim that AHFC believed the contract required the Spruce Park buildings to be completely destroyed. After examining the evidence presented by Sprucewood, the most that can be said is that while all of the AHFC employees testified that the contract required the buildings to be broken into pieces, each also acknowledged that the contract did not require those pieces to be broken into small pieces.[19] The testimony of the AHFC employees might be relevant to the question of whether the contract, considered in isolation from the extrinsic evidence, was subject to reasonable alternative interpretations. But it does not challenge AHFC's claim that, when the contract was formed, AHFC believed that it required destruction of the buildings rather than their removal and sale.

More importantly, there is also no serious dispute over whether Northern Construction believed, when the contract was formed, that the contract allowed the buildings to be removed and sold instead of destroyed. In its brief to this court, Northern Construction essentially admits that its president, Timmons, did not form an intention to remove and sell the buildings until after the contract was formed.[20]

Given AHFC's specific representations to Northern Construction prior to the contract's formation, it is not hard to understand why Northern Construction initially believed the contract required the buildings' destruction. AHFC Procurement Officer Gloria Dunmore affied that she informed Northern Construction that it would not be awarded the contract if it did not intend to demolish the buildings, and also affied that Timmons agreed to demolish them. Similarly, Construction Coordinator Dave Gonzales affied that before Northern Construction was awarded the contract, Timmons asked if the contract allowed Northern Construction to remove the buildings from the site and sell them, but was told that Northern Construction was required to completely demolish the buildings and could not sell them. In its briefs, Northern Construction does not contest the accuracy of these assertions.

■ Because AHFC and Northern Construction attached the same meaning to the contract's terms, and knew or had reason to know (through the discussion between AHFC's representatives and Timmons) of the other's intended meaning, the contract is enforceable in accordance with that meaning.[21]

Sprucewood argues that the contract could reasonably be interpreted to permit removal and sale of the buildings, pointing to the extrinsic evidence of other bidders' belief that the contract permitted removal and sale, trade practice, and the discretionary salvage provisions of the contract itself. But what any other bidder could have understood the contract to mean is irrelevant, as there is no dispute over the terms to which the parties

---

19. AHFC Construction Director Vicki Williams testified that the contract required the contractor to disassemble the Spruce Park buildings, although it was not required to "mash up the floors into a million little pieces." AHFC employee John Felton also testified that the contract required the contractor to disassemble the buildings, although it was not required to "chop up the floor [or] ... the roof in certain size pieces." Similarly, Pannone testified that the contractor was required to knock the buildings into pieces, but was not required to "sit there and chop up the roof [or] ... floor—the wood into really small pieces...." So, too, did Gonzales, who testified that the contractor was required to break the building into pieces, but didn't have to "mash [the pieces] up."

20. *See supra* p. 1159.

21. *See* Kniffin, *supra* note 17, § 24.5 at 15. The same would be true even if, when the contract was formed, Northern Construction had harbored a secret belief that the contract's terms allowed the buildings to be moved and sold, given the fact that AHFC told Northern Construction that AHFC understood the contract to require complete demolition of the buildings and Northern Construction did not challenge AHFC's understanding of the contract's terms. *See id.* at 18 ("If the parties attach different meanings to a contract term at the time of formation and one party is aware of the second party's meaning or has reason to know of it, and provided that the converse is not true, a contract is formed, and the term is interpreted in accordance with the second party's meaning.").

actually agreed.[22] Because there is no dispute that, when the contract was formed, both AHFC and Sprucewood believed that it required complete demolition of the Spruce Park buildings rather than their removal and sale, and there is no question that Northern Construction removed and sold the buildings rather than demolishing them, the superior court did not err in granting summary judgment in favor of AHFC on its breach of contract claim and against Northern Construction on its breach of contract counterclaim.[23]

### 2. Did Judge Savell err by failing to require exhaustion?

██ Sprucewood also briefly argues that Judge Savell erred by not requiring AHFC to exhaust the contract's dispute resolution procedure, which required claims to be submitted to the contracting officer, before seeking relief in court. In reply, AHFC argues that requiring AHFC to exhaust the contractual dispute resolution proceeding would have been futile because the buildings were under the control of Sprucewood, over whom the contracting officer had no power.

██ "[T]he failure to exhaust remedies may be excused due to severe impracticality or futility."[24] The attorney for Northern Construction acknowledged at oral argument before the superior court that any decision by the contracting officer could not be enforced against Sprucewood, a non-party to the contract which had control over the buildings. Moreover, the contracting officer herself rejected Northern Construction's request that she hear the case, holding that a determinable controversy no longer existed because neither AHFC nor Northern Construction had present control over the buildings. Because resort to the contractual dispute resolution procedure would have been futile, AHFC was not required to exhaust that contractual remedy before seeking relief before the superior court.

### 3. Did Judge Savell err in his remedies ruling?

██ Finally, Sprucewood argues that Judge Savell abused his discretion by rejecting Sprucewood's Rule 60(b) motion and permitting AHFC to sell the Spruce Park buildings at a competitive auction instead of requiring AHFC to demolish them as originally planned. But Sprucewood offers no legal support for its argument, asserting only that Judge Savell's ruling was "unjust." Absent adequate argument, Sprucewood's claim is waived.[25] Sprucewood has separately argued, moreover, that AHFC's demolition of the buildings would have been "wasteful" and a violation of AHFC's statutory obligations to provide housing for Alaskans. But if it would have been wasteful and a violation of AHFC's statutory obligations for AHFC to demolish the buildings, then it cannot have been an abuse of discretion to permit AHFC to sell them instead.

### C. Did Judge Savell Err in Dismissing Sprucewood's Negligence Counterclaims?

██ Sprucewood argues that Judge Savell erred in dismissing its claims against

---

**22.** See *Kilmer*, 932 P.2d at 765 ("[A party will be] bound not by the outer limits of an ambiguous agreement, but by the terms agreed upon by the parties."). Nor is the fact that AHFC drafted the allegedly ambiguous contract relevant. This court has previously held that the principle that ambiguities in contracts should be construed against their drafters should not be resorted to when other means of ascertaining the reasonable expectations of the parties are available, as they were here. See *Consolidated Pac. Engineering, Inc. v. Greater Anchorage Area Borough ex rel. Greater Anchorage Area Borough Sch. Dist.*, 563 P.2d 252, 256 (Alaska 1977).

**23.** Sprucewood briefly argues that the contract's demolition provisions should be overridden in order to further the public policy interest in providing "safe and sanitary" housing and "rehabilitat[ing]" housing. But to rewrite the contract as Sprucewood desires would deny AHFC the power to control the disposition of its own property. Further, allowing Sprucewood to unilaterally rewrite the contract by non-performance would give Sprucewood an undeserved windfall, as it would not have to pay to purchase the buildings from AHFC.

**24.** *Kleven v. Yukon–Koyukuk Sch. Dist.*, 853 P.2d 518, 524 (Alaska 1993).

**25.** See *Gates v. City of Tenakee Springs*, 822 P.2d 455, 460 (Alaska 1991) (treating claims addressed only in cursory manner as waived).

AHFC for negligently drafting an ambiguous contract. Interpreted in light of the extrinsic evidence of the parties' intent at the time of contracting, however, the contract was not ambiguous.[26] If the contract was not ambiguous, then AHFC cannot have drafted—negligently or otherwise—an ambiguous contract. Sprucewood does not allege that AHFC breached any duties to Sprucewood other than its alleged duty to prepare an unambiguous contract. Accordingly, Judge Savell did not err in granting summary judgment against Sprucewood on its negligence claims.

D. *Did Judge Savell Err in Granting Summary Judgment Against Sprucewood on Its Economic Waste Counterclaim?*

 Finally, Sprucewood argues that AHFC should be liable for "waste." Waste occurs when "the owner of a possessory estate engages in unreasonable conduct that results in physical damage to the [property] and substantial diminution in the value of estates owned by others in the same [property]."[27] Although AHFC was seeking to demolish the buildings when Sprucewood initially asserted waste in its counterclaim, AHFC ultimately did not demolish the buildings and thus did not physically damage the property. Because the property was never physically damaged, Sprucewood's waste claim has been rendered moot.

Even if AHFC had demolished the buildings, moreover, AHFC's actions would not have diminished the value of Sprucewood's estate in the property. Given the resolution of AHFC's breach of contract claims, Northern Construction had no right to sell the buildings to Sprucewood, and thus Sprucewood had no estate in the property. Because Sprucewood had no estate in the property, it was not injured by AHFC's conduct, and so had no standing to bring an action for waste. Judge Savell thus did not err in granting summary judgment to AHFC on Sprucewood's "economic waste" counterclaim.

V. *CONCLUSION*

Because the TRO had expired of its own terms Sprucewood's appeal of the TRO is MOOT. Because the undisputed extrinsic evidence reveals that the parties' intention at the time of contracting was to completely demolish the Spruce Park buildings, because the contract was not ambiguous, and because Sprucewood did not have an interest in the Spruce Park buildings, we AFFIRM the superior court's decision in all respects.

26. *See* Part IV.B.1., *supra.*

27. *See McKibben v. Mohawk Oil Co., Ltd.,* 667 P.2d 1223, 1228 (Alaska 1983), *overruled on other* grounds *by Wien Air Alaska v. Bubbel,* 723 P.2d 627, 631 n. 4 (Alaska 1986).